## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ANGELA MCCASKILL, PH.D**      *
10308 Bunch Berry Lane
Upper Marlboro, Maryland 20772      *

     Plaintiff      *

     v.      *

**GALLAUDET UNIVERSITY**      *
800 Florida Avenue, N.E.
Washington, DC 20002-3695      *

     Defendant      *

     ***SERVE ON:***      *
     T. Alan Hurwitz, Ph. D
     800 Florida Avenue, N.E.      *
     Washington, D.C. 20002-3695
     *

**MARTINA BIENVENU a/k/a "MJ", Ph. D.**      *      Case#:
800 Florida Avenue, N.E.
Washington, DC 20002-3695      *

     Co-Defendant      *

     *

**KENDRA SMITH**      *
800 Florida Avenue, N.E.,
Washington, DC 20002-3695      *

     Co-Defendant      *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT AND REQUEST FOR JURY TRIAL

     **NOW COMES**, Plaintiff, Dr. Angela McCaskill, Ph. D., by and through her attorneys, J.

Wyndal Gordon of **THE LAW OFFICE OF J. WYNDAL GORDON, P.A.**, to submit this

Complaint and Request for Jury Trial pursuant to Fed.R Civ. P. 3 alleging as true the following:

## JURISDICTION

1.      That Plaintiff, Dr. Angela McCaskill, Ph. D. (Hereinafter "Plaintiff") is a resident of the State of Maryland, County of Prince George's.

2.      That Defendant Gallaudet University (hereinafter "Defendant Gallaudet," "Defendant Gallaudet University" or "Defendant") is an Educational Institution as defined by D.C. HRA 2-1401.02(8) located in the Washington District of Columbia.

3.      That at all times alleged herein, Defendant, Martina J. Bienvenu, Ph.D, a/k/a "MJ" (hereinafter "Co-Defendant Bienvenu") was employed by Gallaudet University located in Washington, District of Columbia and at all times alleged herein was acting within the scope of her employment and/or under the doctrine of Respondeat Superior.

4.      That at all times alleged herein, Co-Defendant, Kendra Smith, Ph.D, was employed by Gallaudet University located in Washington, District of Columbia and at all times alleged herein was acting within the scope of her employment and/or under the doctrine of Respondeat Superior.

5.      That jurisdiction conferred pursuant to 28 U.S.C. §1332(a), and 28 U.S.C. §1331, respectively because there is a an actual controversy and complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.00 exclusive of interests and costs, and the case involves a Federal Question; Plaintiff timely registered her claim of Discrimination with the District of Columbia Office of Human Rights under Case No.: 13-127-P (CN).

## VENUE

Plaintiff incorporates by reference the allegations contained in paragraphs 1-5 as if fully set forth herein:

6.      That Venue is proper in this Court pursuant to 28 U.S.C. 1391 (a) as: (1) all of the events giving rise to the complaint occurred in Washington, District of Columbia; and (2) the alleged acts, omissions, and/or injuries involving the Plaintiff occurred in Washington, District of Columbia.

## STATEMENT OF FACTS

Plaintiff incorporates by reference the allegations contained in paragraphs 1-6 as if fully set forth herein:

7.      That Plaintiff Angela P. McCaskill, Ph.D, (hereinafter "Plaintiff") was employed by Defendant Gallaudet University as its Deputy to the President and Associate Provost for Diversity and Inclusion, and Chief Diversity Officer, until Gallaudet University retaliated against her by suspending her, then placing her on indefinite administrative leave, then demoting her to merely Chief Diversity Officer as further alleged herein.

8.      That as Deputy to the President and Associate Provost for Diversity and Inclusion, Plaintiff **was** responsible for "*leadership to foster and advance a strategic and integrated approach to diversity priorities in all aspects of University life*"; and as Chief Diversity Officer, Plaintiff is responsible for "*establishing diversity priorities and enforc[ing] guidelines for the University that ensures equity, inclusion, and social justice.*

9.      That on the 3rd day of October, 2012, Plaintiff received a request via email from an openly gay, Caucasian, female, co-worker, Co-Defendant, Dr. Martina Bienvenu, to meet with

Plaintiff and discuss an issue of same sex marriage in Maryland.

10.      That Plaintiff and Co-Defendant Bienvenu met later in the afternoon, and at that time, Co-Defendant, Bienvenu, confronted Plaintiff in a very hostile manner, about whether Plaintiff signed a Petition to place Proposition 6 (Same-Sex) marriage initiative on the ballot for the November 6, 2012 Maryland general election.

11.      That Plaintiff responded "*Yes, I did sign the petition.*"  She further stated "*I signed the petition at church during a workshop service last July*".

12.      That Plaintiff explained that her signature on the petition solely represented her desire to have the same-sex marriage issue vetted through public discourse so that Maryland voters could become more understanding, informed, and enlightened about the issue once they entered the polls; Plaintiff further explained that it was not an "Anti-gay" petition, and Plaintiff's signature thereupon did not express her opinion on same sex marriage one way or another.

13.      That Co-Defendant, Bienvenu, responded in a very animated manner with her sign-voice elevated, exclaiming:  "*I am really disgusted with you!*" She asked rhetorically, "*Are you still a member of that church?*" –and then criticized Plaintiff's Christian faith and belittled her religious beliefs; Co-Defendant, Bienvenu, actively expressed intolerance of Christian ideologies as it related to homosexuality, --particularly its ideology within the African American church; Bienvenu warned Plaintiff to discontinue her religious services at her church or suffer dramatic consequences.

14.      That Co-Defendant, Bienvenu, further falsely stated, in supercilious fashion, that: (1) the petition was "Anti-gay", (2) Plaintiff's signature upon the petition made her "Anti-gay", and in a threatening manner (3)  sternly reminded Plaintiff that the names and addresses of

4

the people who signed the petition is a matter of public record thereby inferring that harm could

come to her home at the behest of Bienvenu.

15.     Co-Defendant, Bienvenu's stern reminder was stated with the intent to convey a

clear unequivocal threat to Plaintiff's safety and professional reputation; the threat was conveyed

with an aggressive demeanor, a hostile tone, and a scowl or her face, and overly dramatic/active

signing; its intent was to intimidate Plaintiff for engaging in protected activities [i.e., to

participate in the political process free from harassment and discrimination based upon race, sex,

marital status, religion, and hetero-sexual orientation] during her church services, and to dissuade

[with fear] Plaintiff from voting against the measure if she had ever considered doing so.

16.     That Co-Defendant Bienvenu further stated *"I'm thinking about sharing this*

*information with the President and Provost of the University*", i.e., Plaintiff's supervisors, in

order to exact some form or retaliatory disciplinary action against Plaintiff for signing the

legislative initiative.

17.     That Plaintiff responded "*I've nothing to hide, I did nothing wrong*", she further

stated that the same-sex marriage petition would make an excellent panel discussion or debate for

the student body; Plaintiff further stated that she thought "*it would be helpful to get diverse*

*perspectives on sensitive issues such as what it means to sign a legislative initiative regarding*

*the issue of same-sex marriage.*"

18.     That immediately after this meeting, Plaintiff, greatly disturbed emotionally

and distressed by Bienvenu's aggression and hostility towards her, reported to Gallaudet

University President, T. Alan Hurwitz, Bienvenu's attack on Plaintiff's: (1) religion, (2) place of

worship, (3) sexual orientation, (4) traditional marriage, (5) race, as an African American

attending an African Methodist Episcopalian church, (6) right to participate in the political

process free from voter intimidation based upon §§1 - 5, and/or (7) political affiliation/activities

based upon §§1 - 6.

19.     Plaintiff gave President, Hurwitz, the full details of Co-Defendant, Bienvenu's

discriminatory attack; at the time, Hurwitz expressed shock and dismay upon learning of Co-

Defendant Bienvenu's statements, by exclaiming, "*How dare she, that's your right; you have a

right to your opinion and perspective and she had no business approaching you with that*!"; their

conversation ended with Hurwitz referring to Co-Defendant, Bienvenu, as a "*Bully.*"

20.     That President, Hurwitz, assured Plaintiff of her right to engage in the political

process and enjoy her religious services, as a hetero-sexual oriented, traditionally married,

African-American, Christian, woman, and that it was nobody's business but her own; he further

confirmed that Gallaudet has no policy that limits or discourages the political activities of its

employees.

21.     That President, Hurwitz, however, did not investigate Plaintiff's complaint of

harassment and discrimination engaged by Bienvenu; nor did he reprimand or admonish

Bienvenu in any manner for their discriminatory practices or take any action on Plaintiff's

complaint.

22.     That more importantly, President Hurwitz did not: (1) place Bienvenu on

administrative leave with or without pay, (2) threaten to replace her or install an interim faculty

member in Co-Defendant, Bienvenu's current position(s) held at the University, nor (3) publicize

Plaintiff's complaint to the University community or the reasons why he failed to take any

personnel action Co-Defendant, Bienvenu, in response thereto.

23.     That moments later, on October 3, 2012, Plaintiff reported to Gallaudet
University Provost, Stephen Weiner, Co-defendant, Bienvenu's attack upon Plaintiff's religious
beliefs, and her right to engage in protected activity (*to participate in political process free from
discrimination and harassment based upon race, sex, marital status, religion, and hetero sexual
orientation*) by signing a Maryland legislative initiative.

24.     That in response, Weiner advised that Co-Defendant, Bienvenu, had not yet
reported [any complaints] to him and if she does, he will let her know; however, Provost,
Weiner, also failed, refused, and/or simply ignored, Plaintiff's report of unlawful discrimination
against Co-Defendant, Bienvenu; Plaintiff followed up her verbal report with a formal written
complaint dated October 24, 2012 to Elaine Vance, Director of Human Resources.

25.     That despite Plaintiff's complaints of Co-Defendant Bienvenu's unlawful
harassment and discrimination based upon Plaintiff's: (1) religion, (2) place of worship, (3)
sexual orientation, (4) traditional marriage, (5) race, as an African American attending an African
Methodist Episcopalian church, (6)  right to participate in the political process free of voter
intimidation based upon §§1 - 5, and/or (7)  political affiliation/activities because of §§1 - 6, her
complaints were completely ignored by the most prominent University officials, and nothing has
ever been done to address Plaintiff's claims against Co-Defendant, Bienvenu, --not even so much
as an investigation.

26.     That Plaintiff advised Weiner that she wanted to dialogue with the campus
community about Maryland's legislative initiative, she saw it as a teachable moment that could
greatly benefit those who desired a complete understanding of the issues surrounding same-sex
marriage; however, Weiner rejected her suggestion.

27.     On October 4, 2012, Co-Defendant, Bienvenu, and her same-sex partner, Kendra Smith, emailed Gallaudet President, Dr. T. Alan Hurwitz, and Provost, Stephen Weiner, falsely stating that Plaintiff "*[s]igned the petition to place the referendum* **opposing** *same sex marriage on the ballot.*"  Co-Defendant, Bienvenu, and her same-sex partner, Smith, further falsely stated "*[S]igning that petition is an act against many of Gallaudet's constituents.*"

28.     That University Provost, Weiner, responded the same day advising Co-Defendant, Martina Bienvenu, and her same-sex partner, Kendra Smith, that Plaintiff "*has a right to make choices . . . as one of the benefits of living in the United States of America.*"

29.     That nevertheless, on that same day, President Hurwitz scheduled a meeting with Co-Defendant, Bienvenu, and her same-sex partner, Smith.

30.     That Plaintiff requested to be present at this meeting to, *inter alia*, follow-up on her complaint of harassment and discriminatory conduct against Co-Defendant Bienvenu, as well as, defend against Co-Defendant, Bienvenu's "Anti-gay" allegations.

31.     That the University President and Provost denied Plaintiff the right to participate the meeting or follow-up with her own complaint.

32.     That to this day, Defendant Gallaudet University has completely failed or refused to address Plaintiff's complaint of discrimination and harassment against Co-Defendant, Bienvenu, that was clearly brought to its attention on October 3, 2012; and was formalized in writing on or about October 24, 2012.

33.     That on October 5, 2012, University Provost, Stephen Weiner, and University President, T. Alan Hurwitz, met with Co-Defendant, Bienvenu, and her same-sex partner, Smith; after the meeting, Weiner wrote Plaintiff to advise that "*[the meeting] went well;*" but strangely

however, Weiner requested, *"Let's meet . . . I will be available at two in my office.  There are ways to overcome what happened . . . see you then*".

34.     That Plaintiff attended the meeting at 2:00 pm as requested; during this meeting, Provost, Weiner, requested that Plaintiff, *among other things*, publicly apologize in writing to the entire University community for exercising her right to participate in a Maryland legislative initiative so the matter would be over.

35.     That when Plaintiff inquired about her complaint of discrimination against Co-Defendant, Bienvenu, based upon Plaintiff's: (1) religion, (2) place of worship, (3) sexual orientation, (4) traditional marriage, (5) race, as an African American attending an African Methodist Episcopalian church, (6) right to engage in the political process free from voter intimidation based upon §§1 - 5, and/or (7) political/activities because of §§1 - 6, Weiner ignored her complaint too.

36.     That because the University failed to address Plaintiff's complaint of discrimination against Bienvenu and Smith, on or about October 7-8, 2012, Co-Defendant, Bienvenu, and her same-sex partner, Smith, began making false and malicious statements that Plaintiff was "Anti-gay", and on those same dates, from the University campus, Co-Defendants, Bienvenu and Smith, falsely reported to PlanetDeafQueer.com, a Lesbian Gay Bisexual Transgender ("LGBT") publication, that Plaintiff, Gallaudet University Chief Diversity Officer, was "Anti-gay" in an article entitled "*Gallaudet's Chief Diversity Officer Sign's Anti-gay Petition*."

37.     Co-Defendants, Bienvenu and Smith, reported to PlanetDeafQueer.com knowingly false or reckless statements that Plaintiff was "Anti-gay" solely because Plaintiff

signed Maryland's Proposition 6 Petition to place same-sex marriage on the ballot for the November 6, 2012, general election.

38.     Co-Defendants, Bienvenu's and Smith's excessively published false report that Plaintiff was "Anti-gay" and that she signed an "Anti gay" petition, was intentional, and deliberately made to defame Plaintiff and falsely cast aspersions upon Plaintiff's qualifications and competence as the University's CDO, as well as, harm her good name and reputation in academia in the community at-large, as well as in her positions as Deputy to the President and Associate Provost for Diversity and Inclusion.

39.     That on October 9, 2012, when Plaintiff had not, *inter alia*, publicly apologized for signing the petition, and after University's investigation revealed that Plaintiff did in fact sign the petition, President, Hurwitz, immediately suspended Plaintiff, and advised that her position would be filled by an interim Chief Diversity Officer.

40.     That Gallaudet University does not have a policy that prohibits or forbids participation in political activities or the democratic process.

41.     That Hurwitz later advised that Plaintiff was being placed on indefinite "administrative leave", but to further harm Plaintiff, Hurwitz issued a public statement to the University community and world via internet, that Plaintiff was being placed on extended administrative leave for signing the same-sex marriage petition, and that an interim replacement would be installed.

42.     That this personnel matter was excessively published with malice by the University to embarrass, humiliate, torment, and cause Plaintiff severe emotional distress; that as a direct result of the University's publication, Plaintiff suffered depression, sleep deprivation,

lack of concentration, loss of memory, irritability, loss of appetite, hypertension, anxiety, paranoia, fear, intimidation, grief, and severe hot flashes.

43.     That students who praised Plaintiff in the past for being an "*ardent supporter of Gallaudet's LGBTQA Resource Center*", and a *"great ally to the LGBT community"* felt a wide range of emotions from sadness to anger as a direct result of the published false representations to PlanetDeafQueer.com made by Co-Defendant, Bienvenu, and her same-sex partner, Smith, that Plaintiff signed an "Anti-gay" petition.

44.     That no administrative or personnel action was taken against Co-Defendant, Bienvenu (Caucasian, homosexual, woman), for her unlawful discrimination and harassment reported to University officials by Plaintiff; and no administrative or personnel action was taken against Co-Defendant, Bienvenu, for spreading false, vicious, and humiliating rumors that Plaintiff signed an "Anti-gay" legislative referendum, or that Plaintiff was "Anti-gay" because she signed the referendum notwithstanding the fact that she is a traditionally married, heterosexual oriented, African-American, Christian woman.

45.     Instead, Co-Defendant, Bienvenu, (who is **not** a member of at least four of Plaintiff's protected classes) maintained and remained on the job, with full pay and benefits, while she continued to harass and discriminate against Plaintiff; Bienvenu was not even admonished for her misconduct.

46.     That Co-Defendant, Bienvenu, is not just a University professor with tenure, but she is a Gallaudet faculty member, former Chair of the Department of ASL and Deaf Studies, current Vice Chair of the Faculty Senate (Representing Faculty Officers), which is a part of the University's shared governance structure that advises the Provost, President Hurwitz, and the

Board of Trustees.

47.    That Co-Defendant, Bienvenu, is also an internal member of the Diversity

Advisory Board.

48.    That Co-Defendant, Kendra Smith, Bienvenu's same-sex partner, also sits on the

Faculty Senate.

49.    That because Plaintiff was falsely branded "Anti-gay", as a result of the false

representations of Co-Defendant, Bienvenu, and her same-sex partner, Smith, Plaintiff's

reputation and good will as Deputy to the President and Associate Provost for Diversity and

Inclusion, and Chief Diversity Officer, was compromised, and deemed unworthy of trust, by

those in the LGBT community.

50.    That as a further result of the false representations made by Co-Defendant,

Martina Bienvenu, and her same-sex partner, Kendra Smith, Plaintiff suffered internet attacks

where she has been called all sorts of derogatory names, anathema epithets, and suffered vitriol

hatred.

51.    That more importantly, Plaintiff has further suffered irreparable harm to her good

name, professional reputation, and good will, as a result of the false "Anti-gay" representations

aided, abetted, and promoted by the University through its actions, omissions, and excessive

publication of Plaintiff's private personnel matter.

52.    That when Plaintiff returned to work from suspension (subsequently reduced to

administrative leave), she was immediately ___demoted___ from Deputy to the President, and Associate

Provost for Diversity and Inclusion, to merely Chief Diversity Officer.

53.    That Plaintiff was ordered to no longer report to the Provost.

54. That the entire Faculty Senate headed, in part, by Co-Defendant Bienvenu, and her same-sex partner, Kendra Smith, refused to work with Plaintiff, whereas before Co-Defendants Bienvenu's and Smith's false "Anti-gay" representations, their working relationship was polite and cooperative.

55. That the fiscal budget for the Diversity Office subject to Plaintiff's exclusive control and oversight (according to her job description) was cut by 32% ($53,000) by the University, resulting in a budget deficit and unavailability of funds to operate until the next fiscal cycle, October 1, 2013, which detrimentally impacted Plaintiff's optimal performance on the job.

56. That Plaintiff reported these concerns to the President and nothing was done to restore the funds, nor were there any other reasons given for the reduction in budget upon Plaintiff's return to the University campus after her extended administrative leave aside from Plaintiff signing the legislative initiative.

57. That Plaintiff was further forced to endure, verbal abuse, condescension, and castigation for signing Maryland's same-sex marriage legislative initiative during Faculty Senate meetings while President, Hurwitz, nonchalantly looked on, and did nothing to restore order, dignity and respect to Plaintiff or her position as Chief Diversity Officer.

58. That as a result, Plaintiff suffered an exacerbation of her pre-existing symptoms of severe emotional distress, as well as, disrespect, embarrassment, and humiliation.

59. That additionally, on January 7, 2013, Plaintiff received threatening letter from faculty a member; she reported the letter to President, Hurwitz; President, Hurwitz, refused to address it; when questioned by the Diversity Advisory Board in a later meeting about what he intended to do about the letters, President, Hurwitz, responded with a hubris and asked

13

rhetorically in a frustrated tone, "*what do you want me to do about the letters!*"

60.    That Plaintiff's chances of finding other job opportunities at the University or

elsewhere have been severely limited based upon the publication of Plaintiff's purely private

personnel matter and University Vice Chair of the Faculty Senate, Co-Defendant, Bienvenu,

labeling Plaintiff "Anti-gay";

61.    That this matter garnered substantial media attention and information is easily

accessible via "Google," internet search engine.


## COUNT I

## D.C. HUMAN RIGHTS VIOLATION

### *Plaintiff v. Gallaudet*

Plaintiff incorporates by reference the allegations contained in paragraphs 1-61 as if

fully set forth herein:


**General Prohibition**

62.    Section 2-1402.11(a)(1) of the D.C. Human Rights Act ("D.C. HRA") provides

the following:

> General.  It shall be an unlawful discriminatory practice to do any
> of the following acts, wholly or partially for a discriminatory
> reason based upon the **race**, color, **religion**, national origin, **sex**,
> age, **marital status**, personal appearance, **sexual orientation**,
> family responsibilities, disability, matriculation, or **political
> affiliation** of any individual:
>
> > (1)    By an employer.  To fail or refuse to hire, or to
> > discharge, any individual; or **otherwise to**

> **discriminate against any individual,** with respect
> to his compensation, **terms, conditions, or**
> **privileges of employment**, including promotion; or
> to **limit, segregate, or classify his employees in**
> **any way which would deprive or tend to deprive**
> **any individual of employment opportunities**, or
> **otherwise adversely affect his status as an**
> **employee**;

63.     That the definition of marital status and religion is fairly self-explanatory under

the Act, but Section 2-1401.02(28) of the D.C. HRA specifically defines "Sexual orientation" as

male or female homosexuality, heterosexuality, and bisexuality, by preference or practice.

64.     That Defendant Gallaudet University violated §2-1402.11, et seq., of the D.C.

HRA by suspending Plaintiff, then later converting the suspension to administrative leave, for,

among other things, executing a legislative initiative (fostering tolerance, discourse,

enlightenment, and the democratic process) while attending a religious service in her Christian

church on her day of worship.

65.     That Defendant further violated §2-1402.11, et seq., by failing to take *any* action

upon Plaintiff's complaint of unlawful harassment and discrimination despite acknowledging that

both had occurred and continued to occur in the following forms:

A.      Allowing Plaintiff to be publicly humiliated by making a highly unusual

public statement about a purely private personnel matter resulting from the

University suspending then placing Plaintiff on extended administrative

leave, for signing a Maryland legislative initiative.

B.      Ratifying the *de facto* classification of Plaintiff as "Anti-gay" to deprive

her of any alternative employment opportunities, and interfering with her

15

effectiveness as head of the Diversity Office at Gallaudet University.

C.   Demoting Plaintiff from her positions as Deputy to the President and
     Associate Provost for Diversity and Inclusion, and Chief Diversity Officer,
     to merely Chief Diversity Officer;

D.   Substantially reducing the Budget Plaintiff oversees in her Department,
     i.e., Diversity Office, by 32% ($53,000); thereby reducing Plaintiff's
     ability to perform her job successfully throughout the remainder of the
     year due to the unavailability of funds with which to operate;

F.   Undermining and circumventing Plaintiff's decision making authority, job
     duties, and limiting her responsibilities;

G.   Forcing Plaintiff to endure verbal abuse, insults and condescension during
     meetings with the Faculty Senate, and other University organizations lead,
     in part, by Co-Defendants Bienvenu and Smith as a result of their
     knowingly false statements that Plaintiff was Anti-gay.


66.   That by suspending Plaintiff *after* the University investigated the "petition"
incident, then converting the suspension to administrative leave (for the reasons stated above),
Defendant Gallaudet discriminated against Plaintiff on the basis of her traditional marital status,
religion, heterosexual orientation, race and religion; Plaintiff is a member of at least four
protected classes because of her marital status, heterosexual orientation, race, and her religion as
a Christian of the African Methodist Episcopalian denomination.

67.   That Plaintiff further suffered adverse employment action based upon unlawful

discrimination because the terms, conditions and privileges of her employment were substantially altered by being limited in her responsibilities and duty assignments, segregated from the University, and falsely classified as *de facto* "Anti-gay" by University administrators/officials in such a way that deprived her alternative employment opportunities.

68.     That when Plaintiff complained of religious, heterosexual orientation, race, and traditional marital status discriminatory practices, and the University failed to take any action, the University allowed Plaintiff to continue to be harassed and discriminated against by University administrators, officials, faculty and students in the manners described above in ¶64 §§ A - G.

69.     That similarly situated, Co-Defendant, Bienvenu, suffered no administrative nor personnel action, nor did the University make any public statements to the campus community, and world via internet, about the University's decision not to take any personnel/administrative action against Co-Defendant, Bienvenu, for discriminating against and harassing Plaintiff on the basis of her: (1) religion, (2) place of worship, (3) her sexual orientation, (4) her traditional marriage, (5) race, as an African American attending an African Methodist Episcopalian church, (6) right to engage in the political process free from voter intimidation based upon §§1-5, or (7) political affiliation/activities because of §§1 - 6.

70.     That to the contrary, Co-Defendant, Bienvenu, remained on the job, and maintained her positions on the Faculty Senate and Diversity Advisory Board, with full pay and benefits, while Co-Defendant, Bienvenu, continued to harass and discriminate against Plaintiff.

71.     That neither Bienvenu, nor her same-sex partner, Smith, have been investigated nor even admonished for engaging in discriminatory practices.

72.     That Section 2-1402.61 of the D.C. HRA entitled "Coercion or retaliation" states:

"It shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under this chapter."

73.    That Section 2-1402.62 of the D.C. HRA entitled "Aiding or abetting" states:

"It shall be an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of this chapter or to attempt to do so."

74.    That Section 2-1402.68 of the D.C. HRA entitled "Effects Clause" states:

"Any practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice."

75.    That for all of the reasons identified above, Defendant violated §§2-1402.61, 2-1402. 62, 2-1402.68 of the D.C. HRA by (1) suspending Plaintiff, (2) converting the suspension to administrative leave, (3) publicizing the University's very private personnel action to the entire world via internet to embarrass, humiliate, torment and scorn Plaintiff so that her reputation would be irreparably harmed; and (4) retaliating against Plaintiff her not  publicly apologizing for signing Maryland's legislative initiative and for other unlawful reason identified above.

76.    That but for Gallaudet's unlawful conduct above mentioned, Plaintiff's privileges and status as an employee were adversely affected because she was: (1) segregated from the

University, (2) stripped of her duties and limited in her responsibilities, (3) unlawfully classified as *de facto* "Anti-gay", and (4) demoted, in title and responsibility, from Deputy to the President and Associate Provost for Diversity and Inclusion, and Chief Diversity Officer, to merely Chief Diversity Officer.

77.     That the University's actions *en toto* violated Plaintiff's right to be free from unlawful discriminatory practices in the manners identified in ¶64 §§A-G and throughout this complaint, based upon race, marital status, religion, race, and/or sexual orientation as more fully explained below:

### Coercion or Retaliation

78.     That Defendant violated section 2-1402.62 of the D.C. HRA by coercing, interfering with, and/or retaliating against Plaintiff in the exercise or enjoyment of, and/or on account of her exercising or enjoying her right to be free from unlawful discrimination, prohibited by the D.C. HRA.

79.     That specifically, but for Plaintiff's engagement in protected activity (signing legislative initiative) of expressing herself as a married, heterosexual, African-American, Christian woman/voter, who, through prayer and worship, searched for a means to enlighten Maryland voters on the issue of same-sex marriage in such a way to foster discourse, tolerance, and respect for the democratic process, she would not have been retaliated against and thereby suffer adverse the employment action described above and throughout this complaint.

80.     That again, after the University's investigation of the matter confirmed that Plaintiff signed the petition for the reasons above stated, it demanded that she, *inter alia*, publicly

apologize.

81.     That when Plaintiff had not apologized, Defendant took adverse personnel action

against Plaintiff to coerce, interfere with, and/or retaliate against her, by initially suspending her,

then converting the suspension to indefinite extended administrative leave, and publicizing to the

world this very private personnel action via internet.

82.     That upon Plaintiff's return from suspension/administrative leave, Plaintiff

suffered further retaliation in the following forms:

A.     University officials allowing Plaintiff to be publicly humiliated by faculty,

staff, students, and administrators, failing to investigate and take action

against University faculty members responsible for mailing threatening

letters to Plaintiff and engaging in other harassing conduct, once those

matters were brought to the University's attention.

B.     Ratifying the *de facto* classification of Plaintiff as "Anti-gay" to deprive

her of any alternative employment opportunities.

C.     Demoting Plaintiff from her positions as Deputy to the President and

Associate Provost for Diversity and Inclusion, and Chief Diversity Officer,

to just one position of Chief Diversity Officer;

D.     Substantially reducing the Budget Plaintiff oversees in her Department,

i.e., Diversity Office, by 32% ($53,000); thereby affecting Plaintiff's

ability to perform her job successfully throughout the remainder of the

year due to the unavailability of funds to operate.

F.     Undermining and circumventing Plaintiff's decision making authority, job

duties, and limiting her responsibilities;

G.    Forcing Plaintiff to endure verbal abuse during meetings with the Faculty Senate, and other University organizations lead, in part, by Co-Defendants, Bienvenu and Smith as a result of their knowingly false statements that Plaintiff was Anti-gay.

83.    That a but for causal connection existed between the adverse employment action and the retaliation caused by Plaintiff expressing herself during her worship service as a married, heterosexual African American, Christian woman/voter in search of a means (through prayer and worship) to encourage discourse, tolerance, enlightenment, and respect the democratic process.

**Aiding or Abetting**

84.    That Defendant violated section 2-1402.62 of the D.C. HRA , by, *inter alia*, aiding, abetting, Co-Defendants, Bienvenu and Smith, in discriminating against Plaintiff upon being invited, compelled or coerced into doing so by Co-Defendants, Bienvenu and Smith, in the manner identified above.

85.    Defendant Gallaudet had the specific intent to facilitate the commission of a D.C. HRA violations by Co-Defendants, Bienvenu and Smith, which was demonstrated, in part, by the University: (1) making a highly unusual public statement about a private personnel matter before the University community and internet world, (2) publicly communicating its intent to permanently replace Plaintiff for signing the same-sex petition, and (3) segregating Plaintiff from the University campus by placing her on *indefinite* extended administrative leave thereby eliminating her ability to perform on the job, and further limiting her title, duties and

21

responsibilities when she returned.

86.     That Defendant knew what they were doing was wrong because prior to receiving Co-Defendant, Bienvenu's false and malicious grievance, Plaintiff reported to Defendant, Co-Defendants, Bienvenu's and Smith's, discriminatory activities taken against her that involved, among other things, intimidation because of Plaintiff's membership in several protected classes covered by the DC HRA.

87.     That in response, Defendant commented that Co-Defendants Bienvenu and Smith were wrong for interfering with Plaintiff's rights; that notwithstanding this fact, Plaintiff followed-up her verbal report of discrimination with a written complaint that was completely ignored.

88.     That Co-Defendants, Bienvenu and Smith, are persons as defined by the D.C. HRA 2-1401.02(21), and they engaged in unlawful discriminatory conduct by making odious derogatory statements about Plaintiff's religion in a harassing manner solely because Plaintiff is a traditionally married, heterosexual, African American, Christian woman/voter, who engaged in protected activity by signing a legislative initiative while in church (not on campus, during business hours, or in any other way affiliated with the University).

89.     That Defendant assisted or participated in the commission of D.C. HRA violation in the manners identified above in ¶65 §A - G, ¶82 §A - G, and throughout this complaint.

90.     That Defendant used its disciplinary and administrative practice/procedure to discriminate against Plaintiff by suspending her, then converting the suspension to indefinite extended administrative leave, in retaliation for lawfully observing and/or participating in her religious service as a married, African-American, woman with heterosexual orientation.

91.     That similarly situated Co-Defendants, Bienvenu and Smith, did not suffer any

consequences whatsoever (disciplinary or administrative) for engaging in unlawful

discriminatory practices against Plaintiff on the basis of Plaintiff's: (1) religion, (2) place of

worship, (3) sexual orientation, (4) traditional marriage, (5) race, as an African American

attending an African Methodist Episcopalian church, (6) right to engage in the political process

and be free from voter intimidation based upon §§1-5, and/or (7)  political affiliation/activities

because of §§1 - 6.

92.     That as a direct and proximate cause of Defendant's and Co-Defendant's conduct

described above and throughout this complaint, Plaintiff suffered unlawful discrimination with

respect to her terms, conditions, and/or privileges of employment, including the right to private

(not highly publicized) personnel action enjoyed by others similarly situated; Plaintiff further

suffered discrimination because she was limited, segregated, or classified in a way which

deprived or tended to deprive her of employment opportunities, or otherwise adversely affected

her status as an employee (i.e., her duties and responsibilities were completely removed, and

when she returned, they were substantially limited, as well as, her authority undermined.), and

she was demoted in title and prestige.


**Effects Clause Violation**

93.     That Defendant violated section 2-1402.68 of the D.C. HRA by disciplining

and/or administratively segregating Plaintiff for participating in a legislative initiative to place

same-sex marriage on the voting ballot in Maryland.

94.     That Defendant's conduct constituted a practice which has the effect or

consequence of violating the provisions of the D.C. HRA which prohibits unlawful

discriminatory practices based upon one's (1) religion, (2) place of worship, (3) sexual

orientation, (4) traditional marriage, (5) race, as an African American attending an African

Methodist Episcopalian church, (6) right to engage in the political process free from voter

intimidation based upon §§1 - 5, or (7)  political affiliation/activities based upon §§1 -6.

95.     That Defendant's conduct was intentional and malicious and was the but for

cause of serious and substantial harm to Plaintiff.

96.     That as a further direct and proximate cause of Defendants' unlawful

discriminatory practices, Plaintiff suffered severe emotional distress, mental anguish, physical

injuries, pain & suffering, irreparable harm to her name, reputation, and good will, depression,

sleep deprivation, lack of concentration, loss of memory, irritability, loss of appetite,

hypertension, anxiety, paranoia, fear, intimidation, grief, and severe hot flashes.

**WHEREFORE**, Plaintiff demands a judgment against Defendant in the amount of

$2,500,000 in compensatory damages, and $1,000,000 in punitive damages, attorneys fees,

interest, costs, and Plaintiff further requests such other and further relief deemed fair and just.


COUNT II

**DEFAMATION**

Libel/Slander

*Plaintiff v. Bienvenu*

Plaintiff incorporate by reference the allegations contained in paragraphs 1-96 as if

fully set forth herein:

24

97.     That Co-Defendant Martina "MJ" Bienvenu at all times alleged herein was acting within the scope of her employment as a tenured university professor with broad authority to further Gallaudet University's mission to "*[e]nsure the intellectual and professional advancement of deaf and hard of hearing individuals through American Sign Language and English*", and to maintain its reputation as a "*world leader in liberal education.*"

98.     That assuming those duties within the scope of her employment and during business hours, Co-Defendant Bienvenu used (a) university resources, (b) facilities, (c) faculty, (d) students, and (e) equipment, to make false and defamatory statements concerning Plaintiff to third parties, on and off campus, affiliated and unaffiliated with the University, including but not limited to, false and defamatory statements concerning Plaintiff's tolerance for gay lifestyles, to an unrelated internet media outlet known as PanetDeafQueer.com.

99.     That Defendant Bienvenu's false and defamatory statements in writing and/or orally to DeafQueerPlanet.com included the following statements:

(i)     Plaintiff signed an "Anti-gay" marriage petition,

(ii)    Plaintiff is "Anti-gay" because she signed the same-sex marriage petition,

(iii)   Plaintiff has always been a closet "Anti-gay" who was outed by the discovery of her name an "Anti-gay" petition,

(iv)    Plaintiff supports overturning the same-sex marriage legislation, and

(v)     Plaintiff was expected to issue a public apology for signing the petition.

100.    That PlanetDeafQueer.com touts itself as a national nonprofit resource and information center for, by and about the Deaf Lesbian, Gay, Bisexual, Transgender, Transexual, Intersex and Questioning communities, and boasts an average of 15,000 visits per month;

25

PlanetDeafQueer.com published Defendant's false statements on October 8, 2012 in an article

entitled "*Gallaudet's Chief Diversity Officer Sign's Anti-gay Petition.*"

101.   That Defendant Bienvenu published the false statements in writing and/or orally

as identified above without privilege to a third parties, in particular: DeafPlanetQueer.com and

other persons outside of the university institution.

102.   That Defendant Bienvenu's fault in publishing the false statements identified

above in writing and/or orally, amounted to at least negligence; however in the alternative,

Defendant Bienvenu's publishing of the false statements identified above, included malice and/or

a reckless disregard of the truth.

103.   That Defendant Bienvenu's statements were actionable as a matter of law

irrespective of special harm and/or her publication caused the plaintiff special harm; Plaintiff was

actually treated and billed by a medical doctor for physical anxiety, sleep deprivation, depression,

and emotional distress directly and proximately caused by Defendant Bienvenu's publication of

false statements about her.

104.   That Defendant Bienvenu's statements above mentioned were defamatory because

they caused injury to Plaintiff's trade, profession, community standing, and/or lowered her in the

estimation of the community.

105.   That Defendant Bienvenu's statements above mentioned made Plaintiff appear

odious, infamous, and/or ridiculous as a person and as  Deputy to the President and Associate

Provost for Diversity and Inclusion, and Chief Diversity Officer of the Gallaudet University.

106.   That Plaintiff did indeed suffer special harm in the form of being actually

treated and billed by a medical doctor for physical anxiety, sleep deprivation, depression, and

emotional distress directly and proximately caused by Defendant Bienvenu's publication of the false statements about her identified above.

107.    That Plaintiff suffered general damages by being placed on administrative leave from her position of Chief Diversity Officer and Associate Provost for Diversity and Inclusion at Gallaudet University, she was demoted in her position, duties and responsibilities to merely Chief Diversity Officer, her office budget under her exclusive control was cut by 32%, she suffered public humiliation, embarrassment, questioned integrity, shame, mortification, insecurity, severe and non-severe physical and emotional distress, mental anguish, pain & suffering, depression, sleep deprivation, lack of concentration, loss of memory, irritability, loss of appetite, hypertension, anxiety, paranoia, fear, intimidation, grief, and severe hot flashes, and such other non-economic damages reasonably proven at trial.

**WHEREFORE**, Plaintiff demands a judgment against Defendant in the amount of $1,500,000 in compensatory damages, and $1,000,000 in punitive damages, Plaintiff further requests such other and further relief deemed fair and just.


COUNT III

**DEFAMATION**

Libel/Slander

*Plaintiff v. Smith*

Plaintiff incorporate by reference the allegations contained in paragraphs 1-107 as if fully set forth herein:

108.    That Co-Defendant Kendra Smith at all times alleged herein was acting within the

scope of her employment as a tenured university professor with broad authority to further

Gallaudet University's mission to "*[e]nsure the intellectual and professional advancement of*

*deaf and hard of hearing individuals through American Sign Language and English*", and to

maintain its reputation as a "*world leader in liberal education.*"

109.     That assuming those duties within the scope of her employment, Co-Defendant

Smith used  (a) university resources,  (b) facilities,  (c) faculty,  (d)  students, and  (e) equipment,

to make false and defamatory statements concerning Plaintiff to third parties, on and off campus,

affiliated and unaffiliated with the University, including but not limited to, false and defamatory

statements concerning Plaintiff to an unrelated internet media outlet known as

DeafQueerPlanet.com.

110.     That Defendant Smith's false and defamatory statements in writing and/or

orally to DeafQueerPlanet.com included the following statements:

(i)      Plaintiff signed an "Anti-gay" marriage petition,

(ii)     Plaintiff is "Anti-gay" because she signed the same-sex marriage petition,

(iii)    Plaintiff has always been a closet "Anti-gay" who was outed by the

discovery of her name an "Anti-gay" petition,

(iv)     Plaintiff supports overturning the same-sex marriage legislation, and

(v)      Plaintiff was expected to issue a public apology for signing the petition.

111.     That DeafPlanetQueer.com touts itself as a national nonprofit resource and

information center for, by and about the Deaf Lesbian, Gay, Bisexual, Transgender, Transexual,

Intersex and Questioning communities, and boasts an average of 15,000 visits per month;

PlanetDeafQueer.com published Defendant's false statements on October 8, 2012 in an article

entitled "*Gallaudet's Chief Diversity Officer Sign's Anti-gay Petition.*"

112.    That Defendant Smith published the false statements in writing and/or orally identified above without privilege to a third parties, in particular: DeafPlanetQueer.com and other persons outside of the university institution.

113.    That Defendant Smith's fault in publishing the false statements identified above in writing and/or orally, amounted to at least negligence; however in the alternative, Defendant Smith's publishing of the false statements identified above, included malice and/or a reckless disregard of the truth.

114.    That Defendant Smith's statements were actionable as a matter of law irrespective of special harm and/or her publication caused the plaintiff special harm; Plaintiff was actually treated and billed by a medical doctor for physical anxiety, sleep deprivation, depression, and emotional distress directly and proximately caused by Defendant Smith's publication of false statements about her.

115.    That Defendant Smith's statements above mentioned were defamatory because they caused injury to Plaintiff's trade, profession, community standing, and/or lowered her in the estimation of the community.

116.    That Defendant Smith's statements above mentioned made Plaintiff appear odious, infamous, and/or ridiculous as a person and as Chief Diversity Officer of the Gallaudet University.

117.    That Plaintiff did indeed suffered special harm in the form of being actually treated and billed by a medical doctor for physical anxiety, sleep deprivation, depression, and emotional distress directly and proximately caused by Defendant Smith's publication of the false

statements about her identified above.

118.    That Plaintiff suffered general damages by being placed on administrative leave from her position of Chief Diversity Officer Associate Provost for Diversity and Inclusion at Gallaudet University, she was demoted in her position, title duties and responsibilities to merely Chief Diversity Officer, her office budget under her exclusive control was cut by 32%, she suffered public humiliation, embarrassment, questioned integrity, shame, mortification, insecurity, severe and non-severe physical and emotional distress, mental anguish, pain & suffering, and such other non-economic damages reasonably proven at trial.

**WHEREFORE**, Plaintiff demands a judgment against Defendant in the amount of $1,500,000 in compensatory damages, $1,000,000 in punitive damages, attorneys fees, costs, expenses, and Plaintiff further requests such other and further relief deemed fair and just.

COUNT IV

**INVASION OF PRIVACY**

FALSE LIGHT

*Plaintiff v. Bienvenu*

Plaintiff incorporate by reference the allegations contained in paragraphs 1-118 as if fully set forth herein:

119.    That Co-Defendant Bienvenu caused excessive publicity about a false statement, representation or imputation understood to be of and concerning the plaintiff, and which placed Plaintiff in a false light within and outside of the University community to detached third parties in a manner that would be offensive to a reasonable person.

120.    That Co-Defendant Bienvenu reported to PlanetDeafQueer the following false statements concerning Plaintiff's private life with the intent that they receive mass publicity:

(i)      Plaintiff signed an "Anti-gay" marriage petition,

(ii)     Plaintiff is "Anti-gay" because she signed the same-sex marriage petition,

(iii)    Plaintiff has always been a closet "Anti-gay" who was outed by the discovery of her name an "Anti-gay" petition,

(iv)    Plaintiff supports overturning the same-sex marriage legislation, and

(v)     Plaintiff was expected to issue a public apology for signing the petition.

121.    That Co-Defendant Bienvenu knew that those false statements would reach a mass amount of people across the country and throughout the world with the assistance of PlanetDeafQueer.com via the internet.

122.    That Co-Defendant further sent out emails and communicated to LGBTQA students and others the false statements identified above with the intent that those communications  receive mass publicity outside of the University community and they did.

123.    That as a direct and proximate cause of Co-Defendent Bienvenu's communication of false statements concerning Plaintiff's private life, to wit:  her views on same-sex marriage, Plaintiff suffered damages in the form of by being placed on administrative leave from her position of Chief Diversity Officer and Associate Provost for Diversity and Inclusion at Gallaudet University, she was demoted in her position, title, duties and responsibilities to merely Chief Diversity Officer, her office budget under her exclusive control was cut by 32%, she suffered public humiliation, embarrassment, questioned integrity, shame, mortification,

insecurity, severe and non-severe physical and emotional distress, mental anguish, pain & suffering, and such other non-economic damages reasonably proven at trial.

**WHEREFORE**, Plaintiff demands a judgment against Defendant in the amount of $1,500,000 in compensatory damages, and 1,000,000 in punitive damages, costs, expenses, Plaintiff further requests such other and further relief deemed fair and just.

COUNT VI

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

*Plaintiff v. Bienvenu*

Plaintiff incorporate by reference the allegations contained in paragraphs 1-113 as if fully set forth herein:

124.    That for all of the reasons noted above, Defendant Bienvenu engaged in conduct that was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and is regarded as atrocious, and utterly intolerable in a civilized community.

125.    That it was further extreme and outrageous to knowingly and falsely, intentionally and/or recklessly report to third persons outside of the University community that the Deputy to the President and Associate Provost for Diversity and Inclusion, and Chief Diversity Officer was anti-gay merely because she signed a legislative initiative [at church during worship service] to place the issue of same-sex marriage on Maryland's ballot, and then lambast her [as being Anti-gay] in the media and before the University community under which she served to meet the needs of the statutorily protected classes of students to increase diversity, inclusion, and tolerance at the University.

126.    That is was further extreme and outrageous conduct to continue to harass and discriminate against Plaintiff in open University forums in the most hostile, belligerent and disrespectful manner before the Faculty Senate and University Board of Director's by further charging her with being Anti-gay for signing the Maryland legislative initiative and exposing her to scorn and ridicule by University officials and directors.

127.    That it was further extreme and outrageous conduct to request that University officials that Plaintiff, the Deputy to the President and Associate Provost for Diversity and Inclusion, and Chief Diversity Officer, be forced to apologize for signing the legislative initiative [at church during her worship service] or be subjected to a false media campaign, student protests, suspension from the University, attend Diversity training classes, and be removed from office based upon a knowingly false and intentional and/or reckless allegation made by Defendant to various third parties inside [President Hurwitz, Provost Weiner] and outside [Planetdeafqueer.com] of the University community that Plaintiff was Anti-gay merely for engaging in the democratic process [by signing the legislative initiative] in Maryland where resided.

128.    That it was further extreme and outrageous conduct to make intentionally make threats to Plaintiff advising that she knows where she lives, and send threatening letters to Plaintiff referring to her as an N*gger, suggesting violence was imminent, and warning Plaintiff to discontinue attending her church where she signed the legislative initiative or suffer detrimental consequences at Bienvenu's behest because she considered the church [having never attended] and thus Plaintiff to be Anti-gay.

129.    That all of the above conduct intentionally or recklessly caused the Plaintiff to

33

suffer severe emotional distress in manners that included but were not limited to: depression, sleep deprivation, lack of concentration, loss of memory, irritability, loss of appetite, isolation, hypertension, anxiety, paranoia, fear, intimidation, grief, and severe hot flashes.

130.    That as a direct and proximate cause of Defendant's conduct Plaintiff required medical treatment from healthcare professionals and remains under her doctors' care today.

131.    That as a further direct and proximate cause of Defendant's conduct, Plaintiff suffered humiliation, embarrassment, questioned integrity, shame, mortification, insecurity, severe and non-severe physical and emotional distress, mental anguish, pain & suffering, and such other non-economic damages reasonably proven at trial.

132.    That Plaintiff was further demoted in her position, title, duties and responsibilities to merely Chief Diversity Officer, and her office budget under her exclusive control was cut by 32%.

**WHEREFORE**, Plaintiff demands a judgment against Defendant in the amount of $1,500,000 in compensatory damages, and 1,000,000 in punitive damages, Plaintiff further requests such other and further relief deemed fair and just.


COUNT VII

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

*Plaintiff v. Gallaudet University*

Plaintiff incorporate by reference the allegations contained in paragraphs 1-132 as if fully set forth herein:

34

133.    That for all of the reasons noted above, Defendant University engaged in conduct that was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and is regarded as atrocious, and utterly intolerable in a civilized community.

134.    That it was further extreme and outrageous to knowingly and falsely, intentionally and/or recklessly report to third persons inside and outside of the University community that the Deputy to the President and Associate Provost for Diversity and Inclusion, and Chief Diversity Officer was anti-gay merely because she signed a legislative initiative [at church during worship service] to place the issue of same-sex marriage on Maryland's ballot, and then publish Plaintiff's very private personnel matters in the media and before the University community under which she served to meet the needs of the statutorily protected classes of students to increase diversity, inclusion, and tolerance at the University.

135.    That is was further extreme and outrageous conduct to turn a blind eye to continued to harassment and discriminate against Plaintiff because of Plaintiff's: (1) religion, (2) place of worship, (3) sexual orientation, (4) traditional marriage, (5) race, as an African American attending an African Methodist Episcopalian church, (6) right to engage in the political process and be free from voter intimidation based upon §§1-5, and/or (7)  political affiliation/activities because of §§1 - 6, in open University forums in the most hostile, belligerent and disrespectful manner before the Faculty Senate and University Board of Director's by further allowing [and thereby ratifying or condoning] her castigation by peers and University officials for signing the Maryland legislative initiative and exposing her to scorn and ridicule by more University officials and directors.

136.    That it was further extreme and outrageous conduct to suspend Plaintiff then

convert it to administrative leave, to demote Plaintiff, cut her budget, allow her to be subject to ridicule and scorn before the University Board of Directors, and knowingly and/or foreseeably allow her to be subjected a false media campaign, student protests, because she would not apologize for engaging in the democratic process [by signing the legislative initiative] in the State of Maryland where resided.

137.    That it was further extreme and outrageous conduct to make intentionally make threats to Plaintiff advising that she knows where she lives, and send threatening letters to Plaintiff referring to her as an N*gger, suggesting violence was imminent, and warning Plaintiff to discontinue attending her church where she signed the legislative initiative or suffer detrimental consequences because she considered the church [having never attended] and thus Plaintiff to be Anti-gay.

138.    That all of the above conduct intentionally or recklessly caused the Plaintiff to suffer severe emotional distress in manners that included but were not limited to: depression, sleep deprivation, lack of concentration, loss of memory, irritability, loss of appetite, hypertension, anxiety, paranoia, fear, intimidation, grief, and severe hot flashes.

139.    That as a direct and proximate cause of Defendant's conduct Plaintiff required medical treatment from healthcare professionals and remains under her doctors' care today.

140.    That as a further direct and proximate cause of Defendant's conduct, Plaintiff suffered humiliation, embarrassment, questioned integrity, shame, mortification, insecurity, severe and non-severe physical and emotional distress, mental anguish, pain & suffering, and such other non-economic damages reasonably proven at trial.

141.    That Plaintiff was further demoted in her position, title, duties and responsibilities to merely Chief Diversity Officer, and her office budget under her exclusive control was cut by 32%.

**WHEREFORE**, Plaintiff demands a judgment against Defendant in the amount of $1,500,000 in compensatory damages, and 1,000,000 in punitive damages, Plaintiff further requests such other and further relief deemed fair and just.

Respectfully submitted,


_____
J. Wyndal Gordon
Fed. Bar no.: MD23572
**THE LAW OFFICE OF J. WYNDAL GORDON, P.A.**
10 North Calvert Street, Suite 930
Baltimore, Maryland 21202
410.332.4121 o
410.347.3144 f
jwgaattys@aol.com
Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ANGELA MCCASKILL, PH.D**                    \*
10308 Bunch Berry Lane
Upper Marlboro, Maryland 20772                \*

    Plaintiff                             \*

    v.                                    \*

**GALLAUDET UNIVERSITY**                      \*
800 Florida Avenue, N.E.
Washington, DC 20002-3695                     \*

    Defendant                             \*

    ***SERVE ON:***                       \*
    T. Alan Hurwitz, Ph. D
    800 Florida Avenue, N.E.              \*
    Washington, D.C. 20002-3695
                                          \*

**MARTINA BIENVENU a/k/a "MJ", Ph. D.**       \*          Case#:
800 Florida Avenue, N.E.
Washington, DC 20002-3695                     \*

    Co-Defendant                          \*

                                          \*

**KENDRA SMITH**
800 Florida Avenue, N.E.,                     \*
Washington, DC 20002-3695
                                          \*
    Co-Defendant
                                          \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## JURY TRIAL REQUEST

Plaintiff requests a Jury Trial in this matter.

Respectfully submitted,

_____
J. Wyndal Gordon
Fed. Bar no.: MD23572
**THE LAW OFFICE OF J. WYNDAL GORDON, P.A.**
10 North Calvert Street, Suite 930
Baltimore, Maryland 21202
410.332.4121 o
410.347.3144 f
jwgaattys@aol.com
Attorney for Plaintiff