**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ANGELA MCCASKILL, |
| Plaintiff, |
| v. |
| GALLAUDET UNIVERSITY, |
| Defendant. |

Civil Action No. 13-1498 (JEB)

<u>**MEMORANDUM OPINION**</u>

As Gallaudet University's Chief Diversity Officer, Plaintiff Angela McCaskill was tasked with promoting a diverse and inclusive college community. In October 2012, several of McCaskill's coworkers learned that she had signed a petition to place Maryland's Proposition 6 – a state constitutional amendment that would have banned same-sex marriage – on the ballot. When this fact became more widely known on campus, Gallaudet administrators decided that McCaskill's ability to advocate for her constituents – in particular the university's gay community – had been compromised. As a result of that decision – or, as Plaintiff tells it, because of her race, religion, marital status, sexual orientation, and political affiliation – Gallaudet placed her on administrative leave and, ultimately, demoted her. When the university failed to restore McCaskill to her position after the furor had died down, she brought this diversity action alleging that the university had violated the D.C. Human Rights Act's prohibitions against various forms of discrimination and had intentionally or negligently caused her emotional distress. She asserts, moreover, that after she signed the petition, the university – acting through two of its employees – defamed her and placed her in a false light.

1

Gallaudet has now responded by filing two Motions to Dismiss. The first argues that those two employees, whom Plaintiff voluntarily dismissed by filing an Amended Complaint, are indispensable parties; as their joinder would destroy diversity, the motion asserts, the suit cannot proceed. The second contends that McCaskill has not sufficiently pled facts to support any of her claims. Convinced by Defendant's substantive arguments, the Court will grant its second Motion and dismiss this case.

I.      **Background**

According to Plaintiff's Complaint, which the Court must presume to be true for the purpose of these Motions, McCaskill was employed at Gallaudet at all times relevant to this case, and at least since 2012. <u>See</u> Compl., ¶ 7. As Deputy to the President of the university, Associate Provost for Diversity and Inclusion, and Chief Diversity Officer, she was responsible for "foster[ing] and advanc[ing] a strategic and integrated approach to diversity priorities in all aspects of University life" and "establishing diversity priorities and enforc[ing] guidelines for the University that ensure[] equity, inclusion, and social justice." <u>Id.</u>, ¶ 8.

On October 3, 2012, McCaskill received an e-mail from a co-worker, Dr. Martina Bienvenu, in which Bienvenu asked for a meeting to discuss an issue related to same-sex marriage in Maryland. <u>Id.</u>, ¶ 9. At the meeting, Plaintiff alleges, Bienvenu "confronted [her] in a very hostile manner" regarding Plaintiff's decision to sign a petition to place Proposition 6 on the ballot. <u>Id.</u>, ¶ 10. Plaintiff responded, "Yes, I did sign the petition. . . . I signed the petition at church during a [worship] service last July." <u>Id.</u>, ¶ 11. At that point, McCaskill complains, Bienvenu "responded in a very animated manner," exclaiming, "I am really disgusted with you!" and asking, "Are you still a member of that church?" before "criticiz[ing] Plaintiff's Christian faith and belittl[ing] her religious beliefs." <u>Id.</u>, ¶ 13. The interaction concluded with Bienvenu's

telling Plaintiff that the names and addresses of the people who signed the petition were a matter of public record, which Plaintiff took to imply "that harm could come to her home at the behest of Bienvenu." Id., ¶ 14.

Plaintiff believes, moreover, that Bienvenu did not leave things there. Instead, she alleges, Bienvenu and her partner, Kendra Smith, spoke anonymously to PlanetDeafQueer.com, telling the web site, among other things, that Plaintiff had signed an "anti-gay" marriage petition and that she supported overturning Maryland's same-sex-marriage legislation. See id., ¶¶ 99, 110.

"[G]reatly disturbed emotionally," id., ¶ 18, Plaintiff took the matter to the Gallaudet administration. Although the President of the university expressed "shock and dismay" at Bienvenu's actions, id., ¶ 19, no investigation was forthcoming, Bienvenu was not punished, see id., ¶¶ 21-25, and Plaintiff's mistreatment at the hands of the Gallaudet faculty continued. See id., ¶ 57. The university placed her on "administrative leave," see id., ¶ 41, and ultimately demoted her and cut her office's budget by 32 percent. See id., ¶¶ 52, 55. Despite several requests for redress, Plaintiff never got her old job back.

Feeling she had no other options, McCaskill filed this suit in September of 2013, asserting causes of action against Gallaudet for discriminatory treatment, disparate impact, retaliation, maintenance of a hostile work environment, and aiding and abetting discrimination, all in violation of the DCHRA (Count I); intentional infliction of emotional distress (Count V); and negligence (Count VI); and against both the university and Bienvenu and Smith for defamation and false-light invasion of privacy (Counts II-IV). In December, Plaintiff voluntarily dismissed Bienvenu and Smith, whose presence would have defeated diversity . See Mot. for Leave to File Amended Complaint, ¶ 1. Gallaudet has now moved to dismiss on the grounds that

the two individual defendants are necessary parties under the Federal Rules of Civil Procedure and that Plaintiff has failed to adequately plead any of her claims.

## II.     Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of an action where a complaint fails "to state a claim upon which relief can be granted."  In evaluating Defendant's Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The notice-pleading rules are "not meant to impose a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and she must thus be granted every favorable inference that may be drawn from her allegations of fact.  See Sparrow, 216 F.3d at 1114.

"[D]etailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), but "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Twombly, 550 U.S. at 570).  Plaintiffs must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  The Court need not accept as true "a legal conclusion couched as a factual allegation" or an inference unsupported by the facts set forth in the Complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (internal quotation marks omitted).  Although a plaintiff may survive a 12(b)(6) motion even if "recovery is very remote and unlikely," Twombly, 550 U.S. at 556

(citing <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." <u>Id.</u> at 555.

Federal Rule of Civil Procedure 12(b)(7) also outlines a standard for dismissal, in this case for "failure to join a [necessary] party under Rule 19." The burden is on the defendant to show that joinder is required, <u>see</u> <u>Citadel Inv. Grp., LLC v. Citadel Capital Co.</u>, 699 F. Supp. 2d 303, 317 (D.D.C. 2010), and courts have generally been reluctant to grant Rule 12(b)(7) motions, finding that "dismissal is warranted only when the defect is serious and cannot be cured." <u>Direct Supply, Inc. v. Specialty Hosp. of Amer., LLC</u>, 878 F. Supp. 2d 13, 23 (D.D.C. 2012) (citation omitted). As with Rule 12(b)(6) motions, a court must accept the allegations contained in the plaintiff's complaint as true for the purpose of the Rule 12(b)(7) inquiry. <u>See</u> <u>16th & K Hotel, LP v. Commonwealth Land Title Ins. Co.</u>, 276 F.R.D. 8, 12 (D.D.C. 2011).

## III.    Analysis

Defendant argues that the Court must dismiss Plaintiff's suit in its entirety. Gallaudet begins by addressing the voluntary dismissal of former defendants Bienvenu and Smith, contending that because the two are necessary parties, the litigation may not proceed without them. If the Court reaches the merits, moreover, the university asserts that Plaintiff's claims all fall short. The Court will address each of these arguments in turn.

### A.    Indispensable Parties

Gallaudet first posits that this suit must be dismissed because Plaintiff has failed to join all indispensable parties – namely, Bienvenu and Smith. Federal Rule 19 "establishes [the] procedure for determining whether an action must be dismissed because of the absence of a party needed for a just adjudication." <u>Cherokee Nation of Okla. v. Babbitt</u>, 117 F.3d 1489, 1495-96

(D.C. Cir. 1997).  Rule 19 requires joinder of "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction" if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

If the Court finds that a "required" person has not been joined, it "must order that the person be made a party."  Fed. R. Civ. P. 19(a)(2).  If no necessary party has been excluded, the inquiry ends there and the case may proceed.

No doubt some Rule 19 cases "can be complex," Republic of Philippines v. Pimentel, 553 U.S. 851, 863 (2008), but this one is not.  That is because neither of Rule 19's textual hooks applies.  More specifically, Defendant does not argue that the Court will be unable to "accord complete relief among existing parties" – namely, McCaskill and Gallaudet – without joining Bienvenu and Smith.  Those two prospective defendants, moreover, do not "claim[] an interest relating to the subject of the action."  As a result, the Court need proceed no further; it can conclude at this juncture that neither Bienvenu nor Smith is a required party, and so their exclusion is not a proper basis for dismissal.

B.  D.C. Human Rights Act Claims

Having cleared that hurdle, the Court arrives at the heart of Plaintiff's case: employment discrimination.  The DCHRA proscribes discriminatory employment practices based on an employee's "race, color, religion, national origin, sex, age, . . . or political affiliation," among other things.  D.C. Code § 2-1402.11(a)(1).  In Count I of her Amended Complaint, Plaintiff alleges that Gallaudet violated the DCHRA by: (1) suspending her and subsequently demoting

her in a discriminatory manner; (2) retaliating against her for engaging in protected activity –

namely, signing the petition supporting Proposition 6; (3) promoting a hostile work environment;

(4) aiding and abetting discriminatory actions; and (5) intentionally and maliciously disciplining

her in violation of the statute's "effects clause."  See Am. Compl., ¶¶ 62-96.  None of those

claims, however, can withstand the present Motion to Dismiss.

          1. *Discriminatory Treatment*

      The DCHRA makes it illegal to "discriminate against any individual, with respect to . . .

compensation, terms, conditions, or privileges of employment, including promotion" and to

"limit, segregate, or classify . . . employees in any way which would deprive or tend to deprive

any individual of employment opportunities, or otherwise adversely affect his status as an

employee" on the basis of membership in a protected class.  D.C. Code § 2-1402.11(a)(1).  To

adequately plead discriminatory treatment under the DCHRA, therefore, Plaintiff must establish

that: (1) she is a member of a protected class; (2) she suffered an adverse employment action;

and (3) the unfavorable action gives rise to an inference of discrimination.  See Stella v. Mineta,

284 F.3d 135, 145 (D.C. Cir. 2002).

      McCaskill here alleges discriminatory treatment on the basis of a remarkable number of

grounds: race, religion, sexual orientation, marital status, and political affiliation.  See Am.

Compl., ¶¶ 62-77.  While she correctly asserts that the university's decisions to place her on

administrative leave and, eventually, to demote her constitute the requisite adverse action, her

stumbling block arrives at step three.  To satisfy that third requirement, she must plead facts that

show that the adverse action was taken because of her protected status – that is, that the action

"was not attributable to [a] common legitimate reason[]."  George v. Leavitt, 407 F.3d 405, 412

(D.C. Cir. 2005).  Mere speculation as to the employer's motivation cannot establish a prima

facie case of discrimination.  See Powell v. Washington Metro. Transit Auth., 238 F. Supp. 2d 160, 165 (D.D.C. 2002).

McCaskill, however, does not allege any facts here that could allow a jury to conclude that Gallaudet took prohibited actions because of her membership in any of her claimed protected groups.  This omission is fatal to her discrimination claim.  See Ass'n of Flight Attendants v. U.S. Dep't of Transp., 564 F.3d 462, 465 (D.C. Cir. 2009) (plaintiff's claim of discrimination failed because it contained no more than conclusory allegations of discrimination).

With regard to religion, Plaintiff's Amended Complaint merely asserts that she was placed on leave "for, among other things, executing a legislative initiative . . . while attending a religious service in her Christian church" and that she is a member of a protected class "because of her . . . religion as a Christian of the African Methodist Episcopalian denomination."  Id., ¶¶ 64, 66.  Even if Gallaudet knew of her religious convictions or was aware that those convictions motivated her to sign the petition – a fact that remains hazy on the face of the Complaint – there is no factual allegation that her religion somehow prompted her suspension or demotion.  As a result, although it may be true that McCaskill signed the petition because she is a Christian – and that Bienvenu approached her for the same reason – the university cannot be guilty of discrimination on that basis.

The same is true of Plaintiff's claims of discrimination based on race, marital status, and sexual orientation.  Plaintiff does allege that an unidentified employee of Gallaudet wrote her a nasty letter after it became public that she had signed the petition, see Am. Compl., ¶ 59, and in her Opposition she asserts that this letter included a racial epithet, see Opp. at 37, but she does nothing to tie this incident to the university's personnel decisions or even to link the views in the

anonymous letter to Gallaudet administrators at all.  Nor does she make any coherent argument

that <u>her</u> marital status or sexual orientation, as opposed to her views about <u>other people's</u> home

lives, prompted the university to act.  The best Plaintiff can do on this front is to allege that she

may, at some point, have been called "anti-gay" by one of her co-workers.  <u>See</u> Am. Compl., ¶

67.  This, of course, does not allow the Court to infer that the university suspended her because

of her own marital status or sexual orientation.

        If McCaskill is to prevail on her intentional-discrimination claim, then, she must

convince the Court that Gallaudet discriminated against her on the basis of political affiliation.

Such an argument might initially appear promising since McCaskill's political stance on an issue

generated the controversy.  Yet, the DCHRA does not sweep so broadly.  By the statute's own

terms, "'political affiliation' means the state of belonging to or endorsing any political party."

D.C. Code § 2-1401.02(25).  The D.C. Court of Appeals, moreover, has read the statute

narrowly.  In <u>Blodgett v. University Club</u>, 930 A.2d 210 (D.C. 2007), the plaintiff had been

expelled from a private club in part for his involvement with a right-wing group called the

National Alliance.  Those activities earned the club some negative publicity, so it terminated his

membership.  Even though the court allowed that Blodgett may have been dismissed "based on

his affiliation with the National Alliance," <u>id.</u> at 221, it observed that a plaintiff cannot satisfy the

statute's definition of "political affiliation" by asserting discrimination for "political reasons" or

"politics generally," <u>id.</u> at 221-22, and it found no evidence that Blodgett's group was a political

party "under any ordinary sense and with the meaning commonly attributed to that term."  <u>Id.</u>

(quotation marks omitted).  After all, the D.C. and U.S. Codes treat as political parties only those

groups that nominate candidates for recognized public elections.  <u>See id.</u> at 221 n.10 (citing D.C.

Code § 1-1101.01(10) and 2 U.S.C. § 431(16)). Blodgett did not argue that the National Alliance did any such thing, so the court denied his political-affiliation claim.

McCaskill's claim is even weaker than Blodgett's. She alleges that the university discriminated against her because of her actions – namely, that she signed the Maryland petition – and not because of her membership in any group, let alone any political party. She makes no attempt, moreover, to distinguish her signing a petition from the "general" politicking discussed in <u>Blodgett</u>. The Court, accordingly, will dismiss Plaintiff's intentional-discrimination claim.

2. <i>Retaliation</i>

Next, Plaintiff alleges that Gallaudet suspended and demoted her in retaliation for signing the petition. The DCHRA prohibits an employer from retaliating against an employee "on account of having exercised or enjoyed . . . any right granted or protected under this chapter." D.C. Code, § 2-1402.61(a). "The elements of a retaliation claim under the DCHRA are the same as those under the federal employment discrimination laws." <u>McCain v. CCA of Tenn., Inc.</u>, 254 F. Supp. 2d 115, 124 (D.D.C. 2003). In other words, to prove unlawful retaliation, a plaintiff must show that: "(1) she engaged in [a statutorily protected activity]; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to the exercise of her rights." <u>Holcomb v. Powell</u>, 433 F.3d 889, 901-02 (D.C. Cir. 2006).

It is difficult to make out precisely what protected activity Plaintiff thinks prompted her suspension and demotion. In her Complaint, she alleges that Defendant violated the DCHRA by retaliating against her "on account of her exercising or enjoying her right to be free from unlawful discrimination." Am. Compl., ¶ 78. At first, one might think Plaintiff is claiming that she faced retaliation for complaining that she had been discriminated against. In the next paragraph of her Complaint, however, McCaskill alleges that the "protected activity" in which

she was engaged was "signing [the] legislative initiative" and "expressing herself as a married, heterosexual, African-American, Christian woman/voter, who, through prayer and worship, searched for a means to enlighten Maryland voters on the issue of same-sex marriage in such a way to foster discourse, tolerance, and respect for the democratic process."  Id., ¶ 7.

This, quite simply, is not the sort of "protected activity" contemplated by the statute. Although the plain language of the DCHRA is of limited use, courts have held that the law protects employees who bring or threaten to bring a discrimination claim against their employer. See, e.g., Baloch v. Kempthorne, 550 F.3d 1191, 1198 (D.C. Cir. 2008); Tsehaye v. William C. Smith & Co., 402 F. Supp. 2d 185, 197 (D.D.C. 2005) (citing Jones v. Washington Metro. Transit Auth., 205 F.3d 428, 433 (D.C. Cir. 2000)).  Plaintiff points to no authority – and the Court has found none – that supports the notion that general political activity, political or religious speech, or prayer constitutes protected activity under the DCHRA's retaliation provision.  See Beckwith v. Career Blazers Learning Ctr., 946 F. Supp. 1035, 1042 (D.D.C. 1996) (concluding that plaintiff's participation in Million Man March was not statutorily protected activity for purpose of retaliation claim).

Instead, it seems Plaintiff has attempted to shoehorn a First Amendment argument into her Complaint against Gallaudet by dressing it up as an employment-discrimination allegation. While a citizen has an unfettered right to petition her government, such a constitutional claim aimed at Gallaudet cannot succeed here, as the university and its employees are private parties not subject to the First Amendment's strictures.  See Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974); see also Donohoe v. Wyatt, 546 F. Supp. 753, 757 (D.D.C. 1982) (private employer could not be liable under First Amendment for firing employee in retaliation for his

sending letter to government official).  As a result, Plaintiff's retaliation claim, as it appears, cannot succeed.

### 3.  *Hostile Work Environment*

Plaintiff also alleges that she was subjected to a hostile work environment because of her many protected characteristics.  To prevail on such a claim, a plaintiff must demonstrate that she faced "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 577 (D.C. Cir. 2013) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).  That discrimination, moreover, must have been based on her membership in a protected class.  Kelley v. Billington, 370 F. Supp. 2d 151, 156 (D.D.C. 2005) (citing Jones v. Billington, 12 F. Supp. 2d 1, 11 (D.D.C. 1997), aff'd, 1998 WL 389101 (D.C. Cir. June 30, 1998)).

In evaluating a hostile-work-environment claim, the Court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  Baloch, 550 F.3d at 1201 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).  "The Supreme Court has made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of employment.'"  Leavitt, 407 F.3d at 416 (quoting Faragher, 524 U.S. at 788).  By adhering to these standards, the Court thereby "ensure[s] that [employment-discrimination law] does not become a general civility code" that involves courts in policing "the ordinary tribulations of the workplace."  Faragher, 524 U.S. at 788 (citation and internal quotation marks omitted).

Although the Court must refrain from weighing the credibility of the evidence at this stage, it finds that the limited facts on the record, even as Plaintiff describes them, cannot meet the "demanding standard" for a hostile-work-environment claim under the DCHRA.  Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011).  McCaskill bases her theory on the following evidence:

- "Bienvenu confronted Plaintiff in a very hostile manner about whether Plaintiff signed a Petition to place Proposition 6 . . . on the ballot," Am. Compl., ¶ 10;

- Bienvenu exclaimed: "I am really disgusted with you!" and "criticized Plaintiff's Christian faith and belittled her religious beliefs," id., ¶ 13;

- Bienvenu "sternly reminded Plaintiff that the names and addresses of the people who signed the petition is a matter of public record," id., ¶ 14, with "an aggressive demeanor, a hostile tone, a scowl on her face, and overly dramatic signing," id., ¶ 15;

- "Plaintiff was further forced to endure[] verbal abuse, condescension, and castigation . . . during Faculty Senate meetings," id., ¶ 57; and

- "Plaintiff received [a] threatening letter from [a] faculty . . . member" (possibly using a racial epithet, though that allegation appears for the first time in Plaintiff's Opposition), to which the university president "responded with . . . hubris."  Id., ¶ 59.

These allegations simply do not support Plaintiff's contention that she was subjected to conduct "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris, 510 U.S. at 21.  The indignities that are described in the Amended Complaint – one confrontation with a coworker, unspecified "abuse" at meetings, and one threatening letter from a faculty member (about which nothing more is alleged) – simply do not satisfy that standard.  See, e.g., Leavitt, 407 F.3d at 408, 416–17 (statements by three

employees over six-month period that plaintiff should "go back where she came from," separate acts of yelling, and hostility did not rise to level of severity necessary to find hostile work environment); Badibanga v. Howard Univ. Hosp., 679 F. Supp. 2d 99, 104 (D.D.C. 2010) (dismissing hostile-work-environment claim where plaintiff was placed on administrative leave due to false accusation, his accent was criticized, he was told he was easy to replace with an American, and he was told that his supervisor would not hire other Africans).

Even if the treatment to which Plaintiff was subjected could plausibly occasion a hostile-work-environment claim, moreover, she has offered no facts to support the contention that such alleged mistreatment was due to her membership in any protected class. Indeed, although McCaskill asserts that she was mistreated by her colleagues and her employer "because of her religious expression," Opp. at 15, nothing supports that claim. All we learn from Plaintiff's Complaint is that Bienvenu asked her, "Are you still a member of that church?" Am. Compl., ¶ 13. In her Complaint, McCaskill also alleges that the harassment and discrimination was based in part upon her sexual orientation, "traditional marriage," and "race, as an African American attending an African Methodist Episcopalian church." Am. Compl., ¶ 25. Any mistreatment McCaskill suffered, though, was not based upon her sexual orientation, her marital status, or her race. If the mistreatment occurred, it was based on her decision to sign a political petition. To the extent Plaintiff is arguing that she faced a hostile work environment on account of her political affiliation or her "right to participate in the political process free of voter intimidation," Am. Compl., ¶ 25, that claim fails for the reasons described with respect to discriminatory treatment. See Section III.A.1, *supra*. Nothing in the Complaint ties Plaintiff's alleged mistreatment to anything but her political expression, which is not protected under the DCHRA. The Court will thus dismiss her hostile-work-environment claim as well.

### 4. *Aiding and Abetting*

Plaintiff next attempts to hang her hat on the DCHRA's "aiding-and-abetting" clause. McCaskill, however, misconstrues the thrust of that provision, which makes it "an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provision of this chapter or to attempt to do so." D.C. Code § 2-1402.62. The aiding-and-abetting clause is meant to prohibit an individual from assisting another person in discriminating, retaliating, or creating a hostile work environment. <u>See, e.g.</u>, <u>King v. Triser Salons, LLC</u>, 815 F. Supp. 2d 328, 331 (D.D.C. 2011) ("Courts have held individuals liable under the DCHRA . . . when they aided or abetted in the discriminatory conduct of others . . . [or] when it was alleged that they knew or should have known about the discriminatory conduct and failed to stop it."). How, precisely, that clause would apply to the facts at hand is unclear. Gallaudet, after all, is itself the only party accused of discriminating and retaliating against Plaintiff, so it could not plausibly have aided and abetted itself in those violations. Even if Plaintiff could make out the claim that the university aided and abetted <u>its employees</u> – say, Bienvenu – in creating a hostile work environment, the Court has already concluded that no actionable hostility took place here. In these circumstances, then, Plaintiff's aiding-and-abetting claim also fails.

### 5. *Effects Clause*

Plaintiff's final attempt to invoke the protection of the DCHRA draws on the statute's so-called "effects clause." That provision prohibits "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter." D.C. Code § 2-1402.68. Under the effects clause, "despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some

nondiscriminatory reason." <u>Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.</u>, 536 A.2d 1, 29 (D.C. 1987); <u>2922 Sherman Ave. Tenants' Ass'n v. District of Columbia</u>, 444 F.3d 673, 685 (D.C. Cir. 2006) (adopting D.C. Court of Appeals' interpretation of the clause).

Plaintiff's claim, however, does not fall within the clause's ambit. The DCHRA's effects clause is modeled on the federal disparate-impact doctrine that arose out of <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424 (1971). <u>See</u> <u>Gay Rights Coalition</u>, 536 A.2d at 29. That doctrine prohibits "practices" or "policies" that have the effect of discriminating against a protected group of people. Indeed, "[a] prima facie case of disparate impact requires the identification of a specific employment <u>practice</u> that, while facially neutral, nonetheless had a disproportionate adverse effect on a protected class of <u>individuals</u>." <u>Anderson v. Duncan</u>, No. 06-1565, 2013 WL 5429274, at *9 (D.D.C. Sept. 30, 2013) (emphasis added). Such a claim, moreover, requires a demonstration of causation through "statistical evidence of a kind and degree sufficient to show that the practice in question . . . caused" individuals to suffer the offending adverse impact "because of their membership in a protected group." <u>Watson v. Fort Worth Bank & Trust</u>, 487 U.S. 977, 994 (1988). As a result, one-time decisions that affect only one person are not typically actionable. <u>Cf.</u> <u>Anderson</u>, 2013 WL 5429274, at *9 (citing <u>Watson</u>, 487 U.S. 977 at 994). This limitation makes sense because if disparate-impact claims were available based on the impact of a single incident on a single person, anyone could convert a failed discriminatory-intent claim into one for disparate impact. Neither the authors of <u>Griggs</u> nor the framers of the DCHRA intended such a broad prohibition that would, in effect, swallow the discriminatory-intent rule whole. Plaintiff's effects-clause claim is therefore dismissed.

C. <u>Common-Law Claims</u>

1. *Defamation and False Light*

Plaintiff next asserts that Gallaudet should be held responsible – via *respondeat superior* – for the defamatory and misleading statements Bienvenu and Smith allegedly made to PlanetDeafQueer.com. To state a claim for defamation under D.C. law – which Plaintiff does not contest applies in this diversity action – a plaintiff must show: "(1) that the defendant made a false and defamatory statement [about her]; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." Oparaugo v. Watts, 884 A.2d 63, 76 (D.C. 2005) (quoting Crowley v. North Am. Telecomms. Ass'n, 691 A.2d 1169, 1173 n.2 (D.C. 1997)). Claims of defamation and false-light invasion of privacy relying on identical allegations are analyzed together under District law. See Blodgett, 930 A.2d at 223.

There is no question that McCaskill signed the Maryland petition. If her defamation and false-light claims are to succeed, then, she must show Bienvenu and Smith used language in discussing her and the petition with the online magazine that was both false and attributable to the university. Because the Court concludes that the contested statements constituted protected opinion – rather than demonstrably false fact – it need not address the question of attribution to the university.

Plaintiff alleges that Bienvenu and Smith told PlanetDeafQueer.com that she: (1) "signed an 'Anti-gay' marriage petition"; (2) "is 'Anti-gay' because she signed the . . . petition"; (3) "has always been a closet 'Anti-gay' who was outed by the discovery of her name an [*sic*] 'Anti-gay' petition"; and (4) "supports overturning same-sex marriage legislation." Am. Compl., ¶ 99. To

begin with, McCaskill seems to overlook the fact that the article never used "anti-gay" to refer to <u>her</u>. Instead, it said only that she signed an "anti-gay marriage petition," <u>see</u> Bienvenu & Smith's MTD, Exh. C (<u>Gallaudet's Chief Diversity Officer Signs Anti-Gay Petition</u>), Oct. 8, 2012, and it made no reference to her personal views about homosexuality, marriage, or the potential legislation.

Plaintiff, moreover, offers no facts tending to prove that either Bienvenu or Smith used the term "anti-gay" in conversation with the web site; the text of the article instead implies that it was the <u>author</u>, not the source, who described the petition that way. Plaintiff's claim thus fails to satisfy elements of the first and second requirements of a defamation claim: that the defendant made a statement at all and that the statement was about the plaintiff. <u>See</u> <u>Oparaugo</u>, 884 A.2d at 76.

It appears, in addition, that this whole dispute might not have arisen had the author of the PlanetDeafQueer.com piece been more punctilious in his punctuation. Indeed, the article may not even have intended to call the <u>petition</u> "anti-gay." He may instead have meant "anti-gay-marriage petition." Such a point would hardly have been controversial. As support for that reading, the Court notes that except for the title of the article ("Gallaudet's Chief Diversity Officer Signs Anti-Gay Petition"), each time the phrase "anti-gay" is invoked, it is followed by "marriage petition." The Court finds the phrase "marriage petition" to be an odd construction, and one unlikely to arise in this context. It is likely that the author of the piece, adhering to the more casual conventions of the internet press, left out a final hyphen that would have created the compound adjective "anti-gay-marriage" to describe the "petition," as opposed to applying the descriptor "anti-gay" to "marriage petition." If so, this is an even easier case. Whatever force the label "anti-gay" might have had when applied to the petition is blunted if the article or its

anonymous source instead meant to describe it simply as hostile to <u>gay marriage</u>.  Such an

assertion, after all, is at the very least a protected opinion.  At best, it might well be true.

In any event, even calling the petition or Plaintiff "anti-gay" certainly constitutes a

protected statement of opinion, rather than a false declaration of fact.  "Assertions of opinion on a

matter of public concern receive full constitutional protection if they do not contain a provably

false factual connotation." <u>Guilford Transp. Indus. v. Wilner</u>, 760 A.2d 580, 597 (D.C. 2000)

(internal quotation marks omitted).  "[W]here the question of truth or falsity is a close one,"

moreover, "a court should err on the side of non-actionability."  <u>Moldea v. New York Times Co.</u>,

22 F.3d 310, 317 (D.C. Cir. 1994).  To determine whether a statement is actionable or protected,

the Court must look at both the common usage and full context of the language used in the

statement and the statement's verifiability.  <u>Parsi v. Daioleslam</u>, 595 F. Supp. 2d 99, 109 (D.D.C.

2009) (citing <u>Ollman v. Evans</u>, 750 F.2d 970, 979 (D.C. Cir. 1984)).

Each of these factors tilts in Defendant's favor.  First, the term "anti-gay" carries a host

of definitions and numerous connotations.  Its "common usage or meaning" is thus exceedingly

difficult to pin down.  Although Plaintiff points to one definition suggesting that "anti-gay" can

mean "prejudiced against or opposed to homosexuality or homosexuals," Opp. at 24 (citing

http://oxforddictionaries.com), Defendant finds a similarly reputable source that defines "anti-

gay" as antipathy toward social and civil rights for homosexuals.  <u>See</u> Reply at 11 (citing, *inter*

*alia*, http://www.dictionary.reference.com).  When a term admits of "tremendous imprecision

[in] meaning and usage . . . in the realm of political debate," it takes a lot to conclude that it is a

statement of fact.  <u>Buckley v. Littell</u>, 539 F.2d 882, 893 (2d Cir. 1976) (noting widely divergent

definitions of "fascism" and declining to find the term actionable).  Whether a particular

definition of "anti-gay" accurately characterized the petition, then, is a matter of opinion.

This conclusion makes sense in light of the second <u>Ollman</u> factor, as a statement with a number of possible meanings is by its nature unverifiable. Plaintiff must convince the Court that it is verifiably false that the Maryland petition was "anti-gay." As the petition undeniably sought to place on the ballot a measure that would eliminate marriage rights for homosexuals, this is something she cannot accomplish. Even if the article had called <u>her</u> "anti-gay," which it did not, Plaintiff would still lose. To show that it is verifiably false that she is "anti-gay," McCaskill points out that "[g]iven the broad language of Proposition 6, [she] really could have voted against the measure for a myriad of reasons and still have been supportive of same-sex marriages." Opp. at 25. This statement, however, is itself an opinion. While Plaintiff believes one can sign a petition placing the gay-marriage question on the ballot and remain "pro-gay," others – say, the faculty members and students who questioned McCaskill's continuing employment – might disagree. Because different constituencies can hold different – and completely plausible – views of Plaintiff's actions, statements characterizing those actions constitute protected opinion.

That conclusion finds nationwide support in the case law. Although D.C. courts have not had occasion to decide the issue, to the Court's knowledge no decision has found statements claiming that a person is anti-gay or homophobic to be actionable defamation. <u>See, e.g.</u>, <u>Schumacher v. Argosy Educ. Grp., Inc.</u>, No. 05-531, 2006 U.S. Dist. LEXIS 88068, at *45 (D. Minn. Dec. 6, 2006) ("The Court finds that referring to [plaintiff] as 'homophobic' does not constitute defamation as a matter of law."); <u>Lester v. Powers</u>, 596 A.2d 65, 71 (Me. 1991) (letter to editor asserting that professor was homophobic was protected opinion); <u>Vail v. Plain Dealer Publishing Co.</u>, 649 N.E.2d 182, 186 (Ohio 1995) (article stating that candidate had "engag[ed] in an 'anti-homosexual diatribe' and foster[ed] 'homophobia'" was protected opinion); <u>Waterson</u>

v. Cleveland State Univ., 639 N.E.2d 1236, 1237-40 (Ohio Ct. App. 1994) (letter to editor alleging police officer was homophobic not defamatory as matter of law).

The Court, therefore, holds that the PlanetDeafQueer.com article and its underlying statements are not actionable as defamation or false light.

## 2. *Intentional Infliction of Emotional Distress*

In Count VI of her Amended Complaint, Plaintiff alleges that Defendant engaged in conduct that was "outrageous" and "extreme" and thus constitutes the intentional infliction of emotional distress. Am Compl., ¶ 124. In particular, she contends that Gallaudet caused her distress by choosing to: (1) tacitly encourage Bienvenu and Smith to make the petition dispute public, or, at the very least, fail to punish them once Plaintiff brought their alleged subterfuge to the administration's attention, see id., ¶ 125; (2) "turn a blind eye to continued harassment and discriminate [*sic*] against Plaintiff," id., ¶ 127; (3) "suspend Plaintiff then convert it to administrative leave, . . . demote Plaintiff, [and] cut her budget," id., ¶ 128; and (4) "allow, approve, ratify and/or condone . . . threats to Plaintiff without so much as an investigation." Id., ¶ 129.

McCaskill's allegations, however, again come up empty. To prove a claim of intentional infliction of emotional distress, a plaintiff must show "extreme and outrageous conduct on the part of the defendant which . . . intentionally or recklessly . . . causes the plaintiff severe emotional distress." Duncan v. Children's Nat'l Med. Ctr., 702 A.2d 207, 211 (D.C. 1997) (internal quotation marks omitted); Garay v. Liriano, 943 F. Supp. 2d 1, 23 (D.D.C. 2013). "There is no general duty of care to avoid causing mental distress, and liability is not imposed for all conduct which causes mental distress." Duncan, 702 A.2d at 211. Instead, conduct is considered actionable only when it is "so outrageous in character, and so extreme in degree, as to

go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Bernstein v. Fernandez, 649 A.2d 1064, 1075 (D.C. 1991) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

The bar is even higher in the employment context, as, in general, "employer-employee conflicts do not rise to the level of outrageous conduct." Duncan, 702 A.2d at 711-12. This is especially true when the alleged intentional infliction arises out of an employer's failure to respond to an employee's personnel complaints, see King v. Kidd, 640 A.2d 656, 670-74 (D.C. 1993), termination, see District of Columbia v. Thompson, 570 A.2d 277, 290 (D.C. 1990), or even assault of an employee. Id. Perhaps most aptly, the D.C. Court of Appeals has held that an employer who "manufactured evidence against [an employee] in order to establish a false claim of sexual harassment," "leaked information from the investigation to other employees, and unjustifiably demoted him" was not guilty of intentional infliction of emotional distress. See Kerrigan v. Britches of Georgetowne, Inc., 705 A.2d 624, 628 (D.C. 1997). Plaintiff alleges far less, so her claim meets a similar fate.

### 3. *Negligence*

Plaintiff, finally, alleges in Count VII that Galaudet was negligent in allowing its employees to violate Plaintiff's right to be free from criminal voter intimidation under Maryland Election Code ¶ 16-201. "The foundation of modern negligence law is the existence of a duty owed by the defendant to the plaintiff. Negligence is a breach of duty; if there is no duty, there can be no breach, and hence no negligence." N.O.L. v. District of Columbia, 674 A.2d 498, 499 n.2 (D.C. 1995) (citing Palsgraf v. Long Island Railroad Co., 248 N.Y. 339 (N.Y. 1928)).

Defendant argues that it had no duty to protect Plaintiff from the possibility that another of its employees would harm her in violation of Maryland law. See Gallaudet MTD for Failure

to State a Claim at 29.  After all, "[i]n general no liability exists in tort for harm resulting from the criminal acts of third parties."  Hall v. Ford Enters., Ltd., 445 A.2d 610, 611 (D.C. 1982).  Plaintiff responds that "liability for such harm sometimes may be imposed on the basis of some special relationship between the parties" and argues that she had a "special relationship" with Gallaudet, which, as her employer, had a duty to protect her from voter intimidation.  See Opp. at 42-43 (quoting Hall, 445 A.2d at 611).  In support of that contention, McCaskill points to Kline v. 1500 Massachusetts Ave. Apartment Corp., 439 F.2d 477, 482-83 (D.C. Cir. 1970), which allows that the employer-employee relationship may give rise to a duty of protection against third-party violations of the law.  That case, however, is not nearly enough to support finding such a duty here.

In Kline, the D.C. Circuit noted that in all of the employer-employee cases, "the theory of liability [was] essentially the same; that since the ability of one of the parties to provide for his own protection has been limited in some way by his submission to the control of the other, a duty should be imposed upon the one possessing control . . . to take reasonable precautions to protect the other one from assaults by third parties which, at least, could reasonably have been anticipated."  Id. at 483.  In short, "special-relationship" duties generally arise only if the plaintiff submitted to the control of the defendant and the eventual harm was foreseeable.

Plaintiff's situation is different in at least two ways. First, McCaskill's ability to "provide for [her] own protection" was in no way limited.  Unlike the typical tort case, in which a delivery company, for example, might have a duty to protect its customers from assault at the hands of an employee, see Schecter v. Merchant's Home Delivery, Inc., 892 A.2d 415, 427-31 (D.C. 2006) (finding that this was question for jury), Plaintiff was not in harm's way as a result of her relationship with Gallaudet, and Gallaudet did nothing to prevent her from defending herself.

Second, the canonical cases allowing for the possibility of liability for third-party crimes deal almost exclusively with acts of "violence." Kline, 439 F.2d at 483. Such acts are universally known to be dangerous and, perhaps more relevant here, illegal, so it is not a stretch to expect an employer to foresee that a crime might occur on its watch. Here, the Court believes it safe to assume that the voter-intimidation provision of the Maryland Election Code is not at the forefront of the minds of administrators of a D.C.-based university not actively involved in electioneering of any kind.

Plaintiff attempts to sidestep these limitations by arguing that "University policy" and the common law "confer[] a reasonable duty of protection" on Gallaudet. Am. Compl., ¶ 142. That may very well be true, but the rest of Plaintiff's claim is her undoing. Although she argues that the university's duty of protection required that it shield her from "harmful bullying, harassment, intimidation, threats of violence, and discrimination," id., she has not alleged negligence in the context of any such harassment, contending instead that the university had a duty "to take reasonable measures to prevent Bienvenu from continuing to [attempt to] influence [her in] . . . violation of voter intimidation laws." Id., ¶ 135. The Court, therefore, concludes that the university did not owe Plaintiff a duty to protect her from voter intimidation in violation of the Maryland Election Code. It will, accordingly, dismiss her negligence claim.

IV.     **Conclusion**

For the foregoing reasons, the Court will deny Defendant's Motion to Dismiss for Failure to Join Indispensable Parties, but it will grant the university's Motion to Dismiss for Failure to State a Claim in its entirety and without prejudice. An Order consistent with this Opinion will issue this day.

/s/ James E. Boasberg

24

JAMES E.  BOASBERG
United States District Judge

Date:  <u>April 14, 2014</u>